UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————

№ 06-CV-1909 (JFB) (ARL)

———————

ROBERT NOVAK D/B/A PETSWAREHOUSE.COM,

Plaintiff,

VERSUS

TUCOWS, INC., OPENSRS AND NITIN NETWORKS, INC.,

Defendants.

———————

MEMORANDUM AND ORDER
March 26, 2007

———————

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff Robert Novak ("Novak") brings the present action against defendants Tucows, Inc. and its subsidiary, OpenSRS[1] (collectively, "Tucows") and Nitin Networks, Inc. ("Nitin") (collectively, "defendants"), alleging that defendants' transfer of his internet domain name, "petswarehouse.com," constituted trademark infringement and trademark dilution in violation of the Lanham Act, 15 U.S.C. § 1114, 1117, 1125(a) & 1125(c). Plaintiff also brings pendent state claims, including: conversion, negligence, bailee breach of duty, bailee breach of trust, negligent misrepresentation, breach of contract, tortious interference and intentional infliction of emotional distress.

Presently before the court are defendants' motions to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(3), on the basis of improper venue, or, in the alternative, under Fed. R. Civ. P. 12(b)(6) and 12(b)(1), on the grounds that plaintiff fails to state a federal claim upon which relief may be granted and, absent any federal question, this Court lacks jurisdiction due to an absence of complete diversity between the parties. Plaintiff cross-moves to strike certain of both defendants' declarations and exhibits, and defendant

---

[1] Tucows, Inc. does business under the name OpenSRS; however, there is no legal entity by the name of OpenSRS that is connected with Tucows. (Lazare Decl., ¶ 3; Tucows' Br., at 6 n.6.) Therefore, this Court shall consider Tucows, Inc. and OpenSRS as a single entity.

Tucows moves to strike certain of plaintiff's exhibits.

For the reasons that follow, plaintiff's motion to strike is granted in part and denied in part. Defendant Tucows' motion to strike is granted, and both defendants' motions to dismiss are granted on the basis of improper venue.

I. BACKGROUND

A. The Facts

The following facts are taken from the amended complaint.

In approximately November 1997, Novak registered for and obtained the Internet domain name "petswarehouse.com" through "Bulkregister.com," an internet domain name registration company. (Am. Compl. ¶¶ 36, 38.) He then commenced selling pet supplies and livestock via his website. (*Id.* ¶ 124.) According to Novak, his website was the fourth most-visited pet-supply-related site in the United States during 1999. (*Id.* ¶ 5.) On July 30, 2001, Novak trademarked the domain name "petswarehouse.com" and was awarded trademark number 2,600,670. (*Id.* ¶ 36.)

On February 11, 2003, in the Circuit Court of Colbert County, Alabama, an individual named John Benn obtained a default judgment against Novak in the amount of $50,000. (*Id.* ¶ 37.) Faced with the prospect of litigation in Alabama, Novak, a New York resident, opted to transfer the domain name "petswarehouse.com" from "Bulkregister.com," which was based in Maryland, to another company, Nitin, which was located in New York. (*Id.* ¶¶ 38-39.)

On March 21, 2003, Novak contacted Nitin by telephone in order to initiate the transfer of his domain name. (*Id.* ¶ 39.) A little over one month later, on May 1, 2003, Benn applied for a writ of execution to obtain Novak's domain name "petswarehouse.com" in an effort to enforce the default judgment that he had been awarded against Novak. (*Id.* ¶ 41.) Novak asserts that it was only as a result of the May 1, 2003 writ of execution that he became aware that his domain name was actually being held by Tucows, a Canadian registration company, rather than the New York-based Nitin. (*Id.* ¶ 42.) Novak contacted Nitin on May 2, 2003, and demanded that Nitin transfer registration of "petswarehouse.com" from Tucows back to Nitin. (*Id.*) Novak was told by Nitin that such a transfer was not possible. (*Id.*)

The Alabama trial court's May 1, 2003 writ of execution required Tucows to suspend domain name hosting of "petswarehouse.com" and to turn over the domain name to the Colbert County Sheriff's Department for public auction. (*Id.* ¶ 45; Ex. C.) On May 23, 2003, Tucows transferred control over the domain name to the Alabama court pursuant to the court's order, and access to Novak's servers through the "petswarehouse.com" web address was suspended. (*Id.* ¶ 47, 124; Ex. D.) Internet users accessing "petswarehouse.com" were directed to a web page providing notice of the Colbert County Sheriff's Sale of the domain name pursuant to the Alabama trial court's writ of execution. (*Id.* ¶ 68; Ex. E.) On July 28, 2003, Benn purchased "petswarehouse.com" in a public auction held by the Colbert County Sheriff, in which Benn was the only bidder. (*Id.* ¶ 54.) On September 16, 2003, Tucows transferred the domain name to Benn pursuant to the Alabama trial court's order. (*Id.* ¶ 55.)

2

Novak challenged the Alabama trial court's decision, and on April 2, 2004, the Alabama Court of Civil Appeals reversed Benn's default judgment and writ of execution against Novak on the basis that the judgment had been entered without personal jurisdiction over Novak. (*Id.* ¶ 71.) Armed with the state appellate court decision, Novak demanded that Tucows return control of "petswarehouse.com" to him. (*Id.* ¶ 72.) On October 1, 2004, after Benn was denied rehearing by the Alabama Court of Civil Appeals and the Alabama Supreme Court, Tucows returned the domain name to Novak. (*Id.* ¶ 72-73.)

Plaintiff alleges that the transfer of his domain name out of his control between May 1, 2003 and October 1, 2004 destroyed his pet-supply business. Prior to May 23, 2003, Novak had received approximately 12,000 daily visitors to "petswarehouse.com." (*Id.* ¶ 134.) Following transfer of the domain name, visitors to the website were directed to the sheriff's notice of sale, and Novak was unable to process any pet-supply orders. (*Id.*) According to Novak, Tucows and Nitin's transfer of the domain name out of his control diluted the "petswarehouse.com" trademark in violation of the Lanham Act, 15 U.S.C. § 1125(c). Novak also asserts that the transfer deceptively and misleadingly represented Tucows and Nitin's association with "petswarehouse.com," and constituted unfair competition and cyberpiracy under 15 U.S.C. §§ 1114, 1117 & 1125(a).

B. Procedural History

On April 25, 2006, Novak, proceeding *pro se*, filed the instant complaint against defendants Tucows, Inc. and OpenSRS. By letter dated May 11, 2006, defendant Tucows indicated its intention to move for dismissal on the basis of improper venue. Upon learning of defendants' proposed motion to dismiss, plaintiff modified his claims, adding Nitin as a defendant, and filed an amended complaint on May 16, 2006. On July 10, 2006, defendants Nitin and Tucows moved to dismiss the complaint on the basis of improper venue, or, in the alternative, failure to state a claim and lack of subject-matter jurisdiction. Plaintiff cross-moved to strike the declarations and exhibits submitted by defendants in support of their motions to dismiss, and defendants moved to strike certain of plaintiff's exhibits. Oral argument and an evidentiary hearing were held on December 22, 2006, January 25, 2007 and February 9, 2007.

II. EVIDENTIARY OBJECTIONS

A. Plaintiff's Motion to Strike

1. General Objections to Admissibility of Foreign Declarations

According to Novak, the declarations of two of defendant Tucows' employees in Canada are inadmissible under Fed. R. Evid. 902(12). Rule 902(12) permits foreign documents to be submitted into evidence as self-authenticating business records if accompanied by a declaration signed "in a manner that, if falsely made, would subject the maker to criminal penalty under the laws of the country where the declaration is signed." Fed. R. Evid. 902(12). Novak argues that, in order to meet this requirement, a "jurat including penalty of perjury" under Canadian law should have been provided by defendants with regard to the declarations submitted by Brenda Lazare ("Lazare"), Tucows' Secretary and General Counsel, and Evgeniy Pirogov ("Pirogov"), Team Leader of the OpenSRS Development Team. (Pl.'s Br.,

3

at 25-26.) However, where a matter must be supported by a sworn declaration, a declaration written outside of the United States may be supported "with like force and effect" by a statement in writing that "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. Executed on (date)." 28 U.S.C. § 1746. In this instance, both the Lazare and Pirogov declarations contain the requisite statement, and are therefore admissible. (*See* Lazare Decl., at 9; Pirogov Decl., at 6.)

2. Objections to the Lazare Declaration

According to plaintiff, the Lazare declaration is also defective in failing to authenticate the attached Exhibits J-L as business records. The contested exhibits include: Exhibit J, excerpts from the registrar's agreement between Tucows and ICANN, the non-profit corporation that administers the internet domain name and internet protocol number system; Exhibit K, excerpts from Tucows' registrar license and the registry-registrar agreement between Tucows and Network Solutions, Inc. a/k/a Verisign, Inc. ("Verisign"), a registry that operates and maintains ".com" top-level domain names; and Exhibit L, excerpts from Nitin's reseller application and the reseller agreement between Tucows and Nitin. (Lazare Decl., Ex. J-L.) In the declaration, Lazare, as Secretary and General Counsel of Tucows, clearly sets forth her personal knowledge of the facts stated therein, explaining that she has held her current position overseeing management of the regulatory compliance and disputes department of Tucows since June 2000. (Lazare Decl., ¶ 1-2.) Specifically, Lazare details Tucows' relationship with ICANN, Verisign and Nitin, and clearly sets forth how the related exhibits were created and maintained in the course of "regularly conducted business activity," pursuant to Fed. R. Evid. 803(6). Therefore, the Court finds that Exhibits J-L are properly authenticated by the Lazare declaration and, moreover, are admissible as business records.

Plaintiff further asserts that the Lazare Declaration should be held inadmissible on the basis that it contains legal argument. The Court finds that the first 26 paragraphs of the declaration contain factual descriptions of the domain name registration and transfer processes. (*Id.* ¶¶ 1-26.) However, paragraphs 27-31 of the declaration present legal argument regarding the applicability of the forum selection clause at issue in this case, and as such, those paragraphs shall be disregarded. (*Id.* ¶¶ 27-31.) *See, e.g., Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986) (holding that it was improper for district court to consider "conclusory and hearsay" statements in an attorney affidavit where the statements were not based upon personal knowledge).

3. Objections to the Pirogov Declaration

Novak argues that the Pirogov Declaration lacks personal knowledge, expresses "expert opinion" testimony, and includes hearsay. Pirogov, Team Leader of the OpenSRS Development Team since October 2003, asserts in his declaration that his duties include "supervision of the software development that allows Tucows to process transfers, and maintenance of the logs that archive prior transfers." (Pirogov Decl., ¶¶ 1-4.) Based upon Pirogov's position and his statements, the Court finds that he has sufficient personal knowledge to describe Tucows' domain name transfer process, and to

4

authenticate the exhibits demonstrating that process. Furthermore, the Court finds no basis in the declaration for Novak's assertion that it includes "expert opinion" testimony or hearsay.

In addition, plaintiff objects to the admissibility of Exhibits B-I, authenticated therein, on the basis that they have been newly created for purposes of this litigation, and were not kept in the ordinary course of business. The Court disagrees. First, the Court finds that these exhibits have been authenticated by Pirogov pursuant to Rule 901(b)(9), which permits the admission of "[e]vidence describing a process or system used to produce a result and showing that the process or system produces an accurate result." Fed. R. Evid. 901(b)(9). Furthermore, to the extent that Exhibits B-I are submitted merely as a demonstrative aid, the Court finds that the hearsay rule is not applicable. "[T]here is no requirement that demonstrative evidence be shown to be totally accurate. Rather, alleged inaccuracies go to the weight and not the admissibility of the evidence." 5-900 *Weinstein's Federal Evidence* § 900.07 (2006); *see, e.g., Datskow v. Teledyne Cont'l Motors Aircraft Prod.*, 826 F. Supp. 677, 686 (W.D.N.Y. 1993) (admitting computer-generated animation used to show theory of how accident occurred). Thus, the Court shall consider Exhibits B-I to the extent that they demonstrate the process of transferring domain names, rather than to show the transfer steps specific to "petswarehouse.com."[2]

4. Objections to the Agarwal Declaration

Novak argues that the declaration submitted by Nitin Agarwal ("Agarwal"), CEO and founder of Nitin, contains impermissible hearsay and is not based on personal knowledge. The Court finds, based upon Agarwal's position, that he had personal knowledge of the events relating to Nitin's handling of the transfer of Novak's domain name. Moreover, any potential defects in Agarwal's declaration were subsequently cured by his testimony at the evidentiary hearing, in which he set forth a clear basis for his personal knowledge of Novak's

---

[2] At the evidentiary hearing, Eliot Noss, CEO of Tucows, testified regarding a series of additional exhibits that recreate the steps taken during Novak's transfer of the domain name "petswarehouse.com" based upon information stored in Tucows' databases. This Court ruled that such exhibits were, in fact, admissible for purposes of showing the transfer steps specific to the transaction in question:

> There are a few documents in which the witness testified the computer took data and put it in the form of how it would have appeared on the page at the time to show where the information would have been inputted on the forms as they currently existed at the time of the transaction. I find that that is also admissible. . . . [T]he witness properly laid the foundation for the[m] having retained the data, and for what forms they used at the time, and it was clear to point out that this was not created at the time, but it was recreated to show, based upon what data they stored, where it would have been inputted on their existing forms. So I think it is admissible under the rules of evidence. . . . I think, based upon [Noss'] testimony, they have laid the proper foundation for the admissibility of the documents. So I am admitting Defense Exhibits T1 through 10.

(Transcript of December 22, 2006 Hearing (hereinafter "Dec. 22, 2006 Tr.," at 125-26.)

interactions with Nitin in transferring "petswarehouse.com."

Plaintiff also asserts that the Agarwal Declaration contains the false statement that "[a]t the time of the transfer [March 21, 2003], Nitin Networks was not registering any domain names as a registrar, and was exclusively using Defendant Tucows for all of its registrations and transfers."[3] (Agarwal Decl., ¶ 4.) According to plaintiff, this statement conflicts with evidence that Nitin Networks was, in fact, registering domain names. However, plaintiff's objection does not go to the admissibility of the Agarwal Declaration, but to its credibility and weight.

B. Defendants' Motion to Strike

Defendants contend that plaintiff's Exhibits B, J, K, O-R, U and V, which are printouts of internet pages, constitute inadmissible hearsay and do not fall within any acknowledged exception to the hearsay rule.[4] At the evidentiary hearing, defendants objected to Plaintiff's Exhibit 1, as well as to Plaintiff's Exhibits N-R. (Jan. 25, 2007 Tr. 125-31.) Plaintiff's Exhibit 1 is a printout from "RegisterSite.com," Nitin's website, as it purportedly appeared in 2003. (Pl.'s Ex. 1.) According to plaintiff, he obtained the printout through a website called the Internet Archive, which provides access to a digital library of Internet sites. (Novak Decl., ¶ 2.) The Internet Archive operates a service called the "Wayback Machine," which purports to allow a user to obtain an archived web page as it appeared at a particular moment in time. (*See id.* ¶¶ 3-5.) The other contested exhibits include: Exhibit B, an online summary of plaintiff's past and pending lawsuits, obtained via the Wayback Machine; Exhibit J, printouts of comments on a web message board by Pirogov; Exhibit K, a news article from the Poughkeepsie Journal website featuring Agarwal; Exhibit N, Novak's declaration regarding the authenticity of pages printed from the Wayback Machine; Exhibit O, pages printed from the Internet Archive website; Exhibit P, pages printed from the Wayback Machine website; Exhibits Q, R and U, all of which constitute pages printed from RegisterSite.com via the Wayback Machine; and Exhibit V, a news article from "The Register," a British website, regarding Tucows. (Pl.'s Exs. B, J, K, N-R, U & V.) Where postings from internet websites are not statements made by declarants testifying at trial and are offered to prove the truth of the matter asserted, such postings generally constitute hearsay under Fed. R. Evid. 801. *United States v. Jackson*, 208 F.3d 633, 638 (7th Cir. 2000) (declining to admit web postings where defendant was unable to show that the postings were authentic, and holding that even if such documents qualified under a hearsay exception, they are "inadmissible if the source of information or the method or circumstances of preparation indicate a lack of

---

[3] During the evidentiary hearing, plaintiff cross-examined Agarwal regarding paragraph 4 of his declaration, and Agarwal affirmed "I stand by the full sentence of the statement." (Jan. 25, 2007 Tr. 87.)

[4] During the evidentiary hearing, defendant Tucows also objected to the admission of plaintiff's Exhibit S, a document titled "OpenSRS Quickstart Instructions," and dated January 2001, on the basis that the exhibit had not been authenticated by Tucows. (Jan. 25, 2007 Tr. 46-50.) By letter dated January 30, 2007, Tucows withdrew its objection based upon the authenticity of Exhibit S. (Tucows' January 30, 2007 Letter, at 2.) However, Tucows "reserve[d] the right to argue the immateriality of the document, based both on its contents and the relevance of the 2001 document to events that took place in 2003." (*Id.*)

trustworthiness") (quoting *United States v. Croft*, 750 F.2d 1354, 1367 (7th Cir. 1984)); *see also St. Clair v. Johnny's Oyster & Shrimp, Inc.*, 76 F. Supp. 2d 773, 775 (S.D. Tex. 1999) ("[A]ny evidence procured off the Internet is adequate for almost nothing, even under the most liberal interpretation of the hearsay exception rules.").

Furthermore, in this case, such documents have not been properly authenticated pursuant to Fed. R. Evid. 901. While plaintiff's declaration purports to cure his inability to authenticate the documents printed from the internet, he in fact lacks the personal knowledge required to set forth with any certainty that the documents obtained via third-party websites are, in fact, what he proclaims them to be. This problem is even more acute in the case of documents procured through the Wayback Machine. Plaintiff states that the web pages archived within the Wayback Machine are based upon "data from third parties who compile the data by using software programs known as crawlers," who then "donate" such data to the Internet Archive, which "preserves and provides access to it." (Novak Decl. ¶ 4.) Based upon Novak's assertions, it is clear that the information posted on the Wayback Machine is only as valid as the third-party donating the page decides to make it – the authorized owners and managers of the archived websites play no role in ensuring that the material posted in the Wayback Machine accurately represents what was posted on their official websites at the relevant time. As Novak proffers neither testimony nor sworn statements attesting to the authenticity of the contested web page exhibits by any employee of the companies hosting the sites from which plaintiff printed the pages, such exhibits cannot be authenticated as required under the Rules of Evidence. *See, e.g. Costa v. Keppel Singmarine Dockyard PTE, Ltd.*, No. 01-CV-11015 MMM (Ex), 2003 U.S. Dist. LEXIS 16295, at *29 n.74 (C.D. Cal. Apr. 25, 2003) (declining to consider evidence downloaded from corporation's website in the absence of testimony from the corporation authenticating such documents) (citing *Jackson*, 208 F.3d at 638, and *St. Clair*, 76 F. Supp. 2d at 775 ("Anyone can put anything on the internet. No web-site is monitored for accuracy and nothing contained therein is under oath or even subject to independent verification absent underlying documentation.")). Therefore, in the absence of any authentication of plaintiff's internet printouts, combined with the lack of any assertion that such printouts fall under a viable exception to the hearsay rule, defendants' motion to strike Exhibits B, J, K, N-R, U and V is granted.[5]

### III. STANDARD OF REVIEW

Defendants challenge venue in this case pursuant to Federal Rule of Civil Procedure 12(b)(3). However, the Court must first address the question of whether a motion to dismiss based upon a forum selection clause is properly brought under Rule 12(b)(3) as a challenge to venue, rather than under Rule 12(b)(6) for failure to state a claim or Rule 12(b)(1) for lack of subject-matter jurisdiction.

In *New Moon Shipping Co., Ltd. v. Man B&W Diesel A.G.*, the Second Circuit acknowledged the absence of consensus among the courts regarding the correct procedural mechanism for dismissal of a suit pursuant to a valid forum selection clause.

---

[5] The Court notes that, even if all of plaintiff's exhibits were admissible, they would not impact the Court's analysis or conclusions on the substantive issues in the instant case.

121 F.3d 24, 28 (2d Cir. 1997) (comparing *AVC Nederland B.V. v. Atrium Inv. P'ship*, 740 F.2d 148, 152 (2d Cir. 1984) (applying Fed. R. Civ. P. 12(b)(1) to a motion to dismiss based upon a forum selection clause), with *Paterson, Zochonis (U.K.) Ltd. v. Compania United Arrows, S.A.*, 493 F. Supp. 626, 629 (S.D.N.Y. 1980) (applying Fed. R. Civ. P. 12(b)(3))); *see also Rainforest Café, Inc. v. EklecCo, L.L.C.*, 340 F.3d 544, 546 n.5 (8th Cir. 2003) (recognizing controversy between whether to apply Fed. R. Civ. P. 12(b)(3) or Fed. R. Civ. P. 12(b)(6) to a motion to dismiss based on forum selection clause). In this instance, defendants have framed the forum-selection clause issue as a motion to dismiss pursuant to Rule 12(b)(3), and in the absence of any objection to this framework by plaintiff, the Court shall consider the jurisdictional issue pursuant to this rule. *See, e.g., Person v. Google, Inc.*, 456 F. Supp. 2d 488, 492-93 (S.D.N.Y. 2006) ("Here, the issue will be considered under Fed. Civ. P. Rule 12(b)(3) because that is how it was framed by the parties.") (citing *J. B. Harris, Inc. v. Razei Bar Indus., Inc.*, 37 F. Supp. 2d 186, 189 (E.D.N.Y. 1998) ("The Court does not decide whether this issue might more properly have been raised by way of Rule 12(b)(6), as the issue is squarely framed by Defendants under Rule 12(b)(3) and Plaintiff does not argue that this is an improper procedural mechanism.") (internal citation omitted)).

Without resolving the question of whether to treat the motion to dismiss as a 12(b)(1) or 12(b)(3) motion, the Second Circuit held in *New Moon Shipping* that "at the initial stage of litigation, a party seeking to establish jurisdiction need only make a *prima facie* showing by alleging facts which, if true, would support the court's exercise of jurisdiction." 121 F.3d at 29 (citing *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)); *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005) ("If the court chooses to rely on pleadings and affidavits, the plaintiff need only make a *prima facie* showing of [venue].") (quoting *CutCo Indus. v. Naughton*, 806 F.2d 361, 364-65 (2d Cir. 1986) and citing *Sunward Elecs. v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004)). "After limited discovery on the jurisdictional issue, the matter might be appropriate for resolution on motion supported by affidavits, or, if a genuine dispute of material fact exists, the Court may conduct a hearing limited to Article III standing." *Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 87-88 (2d Cir. 2006) (citations omitted). Disputed facts may be resolved against the non-moving party only after an evidentiary hearing, where the plaintiff must demonstrate venue by a preponderance of the evidence. *New Moon Shipping*, 121 F.3d at 29 ("A disputed fact may be resolved in a manner adverse to the plaintiff only after an evidentiary hearing. . . . [A] party seeking to avoid enforcement of such a contractual clause is also entitled to have the facts viewed in the light most favorable to it, and no disputed fact should be resolved against that party until it has had an opportunity to be heard.") (citations omitted); *Gulf Ins. Co.*, 417 F.3d at 355 ("[I]f the court holds an evidentiary hearing . . . the plaintiff must demonstrate [venue] by a preponderance of the evidence.") (quoting *CutCo Indus.*, 806 F.2d at 364-65) (additional citation omitted); *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1139 (9th Cir. 2004) ("To resolve such motions when genuine factual issues are raised, it may be appropriate for the district court to hold a Rule 12(b)(3) motion in abeyance until the district court holds an evidentiary hearing on the disputed facts. Whether to hold a hearing on disputed facts

and the scope and method of the hearing is within the sound discretion of the district court.") (citations omitted).

In this case, the Court conducted an evidentiary hearing to resolve a disputed material fact as to whether venue is proper in this Court: specifically, whether plaintiff consented to an agreement with defendant Tucows that contained a forum selection clause mandating litigation of all related disputes in Ontario, Canada. At the evidentiary hearing, all parties presented evidence bearing on the question of whether Novak agreed to transfer his domain name to Tucows by clicking his assent to a Domain Name Transfer Agreement ("DNTA") on a website. The DNTA in question contained the following forum selection clause at paragraph 27:

> GOVERNING LAW. This agreement shall be governed by and interpreted and enforced in accordance with the laws of [sic] Province of Ontario and the federal laws of Canada applicable therein without reference to rules governing choice of laws. *Any action relating to this agreement must be brought in Ontario* and you irrevocably consent to the jurisdiction of such courts.

(Pirogov Decl., Ex. H.) The legal effect of a forum selection clause depends upon "whether its existence was reasonably communicated to the plaintiff." *Effron v. Sun Line Cruises, Inc.*, 67 F.3d 7, 9 (2d Cir. 1995) (citations omitted). "A forum selection clause stated in clear and unambiguous language . . . . is considered reasonably communicated to the plaintiff in determining its enforceability." *Vitricon, Inc. v. Midwest Elastomers, Inc.*, 148 F. Supp. 2d 245, 247 (E.D.N.Y. 2001) (citing *Effron*, 67 F.3d at 9). As there is no question that the language of the forum-selection clause at issue is clear and unambiguous, should this Court find that Novak did, in fact, "click-through" the Tucows DNTA, the Court may fairly conclude that the clause was "reasonably communicated" to the plaintiff. *Id.*

IV. THE EVIDENTIARY HEARING

The Court conducted an evidentiary hearing, over several days, to determine whether Novak in fact "clicked-through" his assent to Tucows' DNTA. Based upon the testimony and exhibits presented at the hearing, the Court finds that there is overwhelming evidence that the plaintiff consented to the DNTA with Tucows. Although it is unclear whether plaintiff actually read the agreement, the evidence unequivocally demonstrates that he was required to "click-through" his assent to Tucows' DNTA in order to complete the successful transfer of "petswarehouse.com."

The plaintiff argues that he never agreed to the forum-selection clause, and, further, that he never agreed to enter into any agreement whatsoever with defendant Tucows. According to Novak, when he transferred the domain name "petswarehouse.com" from its original registrar, "Bulkregister.com," he did so solely by phone agreement with Nitin, whose online transfer system was not operational at the time. (Jan. 25, 2007 Tr. 117.) Novak explained that he was not aware that Nitin was actually a reseller, rather than a registrar, of domain names, nor that Tucows was the actual registrar of "petswarehouse.com" until over a month after the transfer, when Benn issued a writ of execution to obtain the domain name from Tucows. (Jan. 25, 2007

9

Tr. 112, 117; Feb. 9, 2007 Tr. 49.) Novak argues that, in fact, his intent in transferring the domain name from "Bulkregister.com" to Nitin was to bring the domain name under the control of a New York-based registrar. (Jan. 25, 2007 Tr. 110-11; Feb. 9, 2007 Tr. 66-67.) According to Novak, had he received a DNTA from Tucows, a Canadian registrar, he "would have declined the transfer, first because [he] would have felt deceived in seeing another company being involved in this transaction, and moreover a company based not only outside New York, but Canada." (Feb. 9, 2007 Tr. 63.)

In response, defendants argue that plaintiff could not possibly have executed transfer of his domain name to Tucows solely by oral agreement by phone with Nitin. According to Tucows, "[p]laintiff's assertion that he transferred the petswarehouse.com domain name orally through Nitin Networks is demonstrably and necessarily false, as the domain name registration system does not permit transfers without the safeguard of an electronic confirmation." (Tucows' Br., at 5.) Contrary to Novak's assertion that he never entered into any agreement with Tucows, Noss testified that such agreements are "necessary" to the domain name transfer process, and that "[t]hey are overwhelmingly – in fact, in our case, almost without exception, they are click-through agreements, ones that are subscribed to on a web page." (Dec. 22, 2007 Tr. 14.) Tucows asserts that, after plaintiff communicated with Nitin by phone, he received notification by email from Tucows that he would have to execute further electronic authorization of the transfer. (Tucows' Br., at 5.) According to Tucows, in the confirmation email, plaintiff was instructed to click on a link directing him to Tucows' website, where he was required to submit a "Transfer Confirmation Form," affirming that he had "both read and understood the Domain Transfer and Registration Contract," and that he "fully accepts the terms of the Domain Name Transfer and Registration Contract."[6] (Tucows' Br., at 4.) A hyperlink to the DNTA was provided on the Transfer Confirmation Form. (Tucows' Br., at 4.) However, Novak categorically asserts that he "never received the e-mail. If I would have, I would have immediately canceled and gone to another registrar in New York." (Feb. 9, 2007 Tr. 66.)

During the evidentiary hearing, Noss, Tucows' CEO, testified, based upon a review of Tucows' records, that the plaintiff had, in fact, engaged in each of the above steps:

> I can say with certainty that, first, the request for transfer was received by Tucows, that we sent a confirmatory e-mail to bob@petswarehouse.com. We have the IP address, in other words, the specific address of the computer that was connected to the internet that received that e-mail. I can say with certainty that that e-mail, coming from IP address, had a link in it which was clicked on. And that e-mail contained a unique password generated solely for the purpose of confirming this transfer. That password was then entered into the web page that resulted from clicking on the link. And I can also say with

---

[6] In addition, Tucows argues that it was clear from the electronic confirmation form that plaintiff would be entering into a contract with Tucows (rather than with Nitin) by language on the form stating that "[t]he domain listed above will be transferred to Registersite.com (An authorized reseller of Tucows)." (Tucows' Br., at 4.)

certainty that on the resulting pages, that the box that says, in effect, I agree with the terms and conditions, was ticked.

(Dec. 22, 2006 Tr. 21-22.) Noss' testimony is fully corroborated by exhibits introduced at the hearing, which are printouts from Tucows' computer database that reflect data generated contemporaneously with Novak's domain name transfer. On March 31, 2003, at 12:28 p.m. and 43 seconds Eastern Standard Time, Tucows received a transfer request. (Dec. 22, 2006 Tr. 30; Defs.' Ex. T2.) Three seconds later, Tucows sent a confirmation email to "bob@petswarehouse.com," Novak's email address.[7] (Dec. 22, 2006 Tr. 30; Defs.' Ex. T2.) On the same day, at 5:07 p.m. and 26 seconds, a hyperlink within the email was clicked by the recipient. (Dec. 22, 2006 Tr. at 58-59; Defs.' Ex. T6.) Less than one minute later, at 5:08 p.m. and 15 seconds, the email recipient typed the required domain name and transfer key into the Tucows website. (Dec. 22, 2006 Tr. at 59; Defs.' Ex. T6.) Finally, at 5:14 pm and 51 seconds, the contract on the website was assented to and the request was submitted. (Dec. 22, 2006 Tr. at 59; Defs.' Ex. T6.) Noss explained that, if Novak had not entered the proper information during each of these steps, or if he had simply ignored the confirmation email from Tucows, the transfer would have failed. (Dec. 22, 2006 Tr. at 60.)

In response, Novak counters that he never engaged in the required steps, and that it was actually Agarwal, CEO of Nitin, who "went directly into the Tucows database, changed the contact info to himself, received the confirmation e-mails, and clicked them off to force the transfer to go through. Alternatively, he modified the database to indicate that that had occurred." (Feb. 9, 2007 Tr. 66.) However, the Court finds Novak's theory that Agarwal manually input false data in order to effect the domain name transfer to be incredible. Based upon the overwhelming evidence that Novak did, in fact, assent to the DNTA, and that a transfer of his domain name to Tucows would not have been possible without such assent, the Court finds, despite Novak's blanket denials and conspiracy theories, that he did enter into such an agreement with Tucows and therefore is subject to the forum-selection clause contained therein, unless there is some ground for the clause to be found invalid. It is the latter issue to which the Court now turns.

V. VALIDITY OF FORUM SELECTION CLAUSE

A. Standard

Under the standard set forth by the Supreme Court in *The Bremen v. Zapata Off-Shore Company*, forum selection clauses are *prima-facie* valid and should control questions of venue absent a "strong showing" that enforcement would be "unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." 407 U.S. 1, 15, 16 (1972). A forum selection clause can bind the parties even where the agreement in question is a form consumer contract that is not subject to negotiation. *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 589-95 (1991). Such clauses will be enforced only if found to be exclusive or mandatory. *John Boutari and Son, Wines and Spirits, S.A., v. Attiki Imp. and Distrib., Inc.*, 22 F.3d 51, 52-53 (2d Cir. 1994). It is clear that the choice of forum is mandatory in this instance, as specific language regarding venue has been

---

[7] Novak concedes that he is the sole user of the email address "bob@petswarehouse.com," and that the address is not case-sensitive." (Feb. 9, 2007 Tr. 27, 28.)

included in the clause, specifying that "any action relating to this agreement must be brought in Ontario." *See, e.g., John Boutari and Son, Wines and Spirits, S.A.*, 22 F.3d at 53; *Docksider, Ltd. v. Sea Tech., Ltd.*, 875 F.2d 762, 763-64 (9th Cir. 1989); *Cent. Nat'l-Gottesman, Inc. v. M.V. "Gertrude Oldendorff,"* 204 F. Supp. 2d 675, 678 (S.D.N.Y. 2002) ("For a forum selection clause to be deemed mandatory, jurisdiction and venue must be specified with mandatory or exclusive language.") (citation omitted).

As the forum selection clause at issue is mandatory, it is enforceable, provided that enforcement would not be unreasonable. A clause is unreasonable: (1) if their incorporation into the agreement was the result of fraud or overreaching; (2) if the complaining party will be deprived of his day in court due to the grave inconvenience or unfairness of the selected forum; (3) if the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) if the clauses contravene a strong public policy of the forum state. *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1363 (2d Cir. 1993) (citing *The Bremen*, 407 U.S. at 10, 15, 18, and *Carnival Cruise Lines, Inc.*, 499 U.S. at 595-96); *S.K.I. Beer Corp. v. Baltika Brewery*, 443 F. Supp. 2d 313, 316 (E.D.N.Y. 2006) (same) (citations omitted). In his moving papers, plaintiff alleges neither that he will be deprived of his day in court due to the inconvenience of litigating this dispute in Ontario,[8] nor that Canadian law is fundamentally unfair and would deprive him of a remedy.[9]

---

[8] In his supplemental reply brief, dated February 21, 2007, Novak asserts for the first time that he is not able to litigate this dispute in Canada for health reasons. In support of this claim, Novak submits a letter from his treating neurologist, Dr. Candice Perkins, M.D., stating that Novak sustained a carotid occulsion and stroke in August 2000 and continues to suffer from a persistent blockage of blood flow to his brain. (Pl.'s Supp. Br., Ex. A.) According to Dr. Perkins, "as a result prolonged travel out of the country (without close contact of [Novak's] medical team) is ill advised." (*Id.*) In fact, while Novak may very well suffer from illnesses that restrict his ability to travel, such impairments did not prevent him from driving cross-country over a two-week span from January 1 to 14, 2007. (Dec. 22, 2006 Tr. 127.) Novak has given no indication that engaging in litigation in Toronto would be more taxing on his health than his recent travel across the United States; therefore, the Court rejects his argument that "[b]ased on [Dr. Perkins'] opinion and my families [sic] concerns I would have to abandon the thought of any cause of action in Canada against Tucows." (Pl.'s Supp. Br., at 2.) Even if Novak were unable to personally attend proceedings in Canada, such deprivation does not necessarily constitute a denial of his day in court. This Circuit has held that "[t]he right to a day in court means not the actual presentation of the case, but the right to be duly cited to appear and to be afforded an opportunity to be heard." *Effron*, 67 F.3d at 11 (quoting *Olsen v. Muskegon Piston Ring Co.*, 117 F.2d 163, 165 (6th Cir. 1941)). "A plaintiff may have his 'day in court' without ever setting foot in a courtroom." *Id.* (citation omitted). While Novak may prefer to bring his case against Tucows in a familiar forum, he consented to bring any such claims in Ontario; in the absence of any showing that plaintiff's health concerns will actually deprive him of his day in court, this Court declines to find that plaintiff should be permitted to evade his contractual obligations.

[9] In his supplemental brief, Novak also raises for the first time the argument that he could be deprived of a remedy under Canadian law because he "doubt[s] very much that court would have jurisdiction over Nitin but more importantly Canada would have no jurisdiction over John Benn as a witness residing in Alabama" and "there

is an issue of the statute of limitation in re-commencing this action in Canada." (Pl.'s Supp. Br., at 2, 3.)

First, a "statute of limitations bar is not a basis for invalidating [a foreign] forum selection clause." *Asoma Corp. v. M/V. Southgate*, 98-CV-7407 (CSH), 1999 U.S. Dist. LEXIS 18974, at *9-*12 (S.D.N.Y. Dec. 7, 1999) (collecting cases); *see also Street, Sound Around Elec., Inc. v. M/V Royal Container*, 30 F. Supp. 2d 661, 663 (S.D.N.Y. 1999) ("By bringing suit here and not in Germany, plaintiffs have effectively chosen to ignore the forum selection clause that they previously agreed to; plaintiffs will not be heard now to complain of any potential timeliness problems that this choice may have created.") (citations omitted); *see also New Moon Shipping*, 121 F.3d at 33 ("[C]onsideration of a statute of limitations would create a large loophole for the party seeking to avoid enforcement of the forum selection clause. That party could simply postpone its cause of action until the statute of limitations has run in the chosen forum and then file its action in a more convenient forum.").

Second, while it is unclear whether Agarwal and Benn could be compelled to appear before a court in Ontario, the Court is not persuaded that this factor suggests the "fundamental unfairness" of litigating the instant dispute in Canada. At least in the context of transfers of lawsuits pursuant to 28 U.S.C. § 1404(a), courts have held that the availability of witnesses does not "tip the balance" with regard to the choice of a forum, particularly where the testimony of such witnesses may be obtained by videotape or deposition. *Dealtime.com Ltd. v. McNulty*, 123 F. Supp. 2d 750, 757 (S.D.N.Y. 2000); (citing Fed. R. Evid. 804(a)(5) and *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 561-62 (S.D.N.Y. 2000) ("[T]he unavailability of process over third-party witnesses does not compel transfer when the practical alternative of offering videotaped or deposition testimony of a given witness exists.") (citations omitted). There is no reason to believe that such alternatives to live testimony are not

Plaintiff's contends: (1) that the "petswarehouse.com" domain name was fraudulently transferred from Nitin to Tucows without his permission, and that holding him to the DNTA would therefore be unconscionable under New York state law because he did not consent to the contract terms, and (2) that the forum selection clause contravenes the public policy of New York state, which protects resident consumers against deceptive business acts and practices under New York General Business Law § 349.

B. FRAUD

Plaintiff alleges, first, that Nitin misled him by falsely representing that Novak would only be interacting with a New York company when he transferred his domain name to Nitin. Plaintiff claims that Nitin concealed the fact that he was merely a reseller of domain names, and that Tucows, a Canadian company, would be the actual registrar. In other words, according to plaintiff, he was lured into transacting with Nitin on the basis of false information and misrepresentation. Plaintiff also alleges that his domain name was fraudulently transferred without his permission from Nitin, with whom he contracted by phone, to Tucows, with whom he did not contract at all. However, even if plaintiff were able to establish valid fraud claims based on these assertions, which he likely cannot, given his "click-through" assent to the Tucows DNTA, such allegations are insufficient to void a forum selection clause on the basis of fraud.

---

available to Novak in this case.

13

Actions capable of overcoming the presumption of validity of a forum selection clause "must be *directly related to that clause, not the contract more generally.*" *Person*, 456 F. Supp. 2d at 494 (citations omitted). The Supreme Court has held that, where a party attempting to defeat a forum-selection clause alleges fraud, courts must look to whether the inclusion of the clause itself was fraudulent:

> In *The Bremen* we noted that forum-selection clauses "should be given full effect" when "a freely negotiated private international agreement [is] unaffected by fraud . . ." This qualification does not mean that any time a dispute arising out of a transaction is based upon an allegation of fraud, as in this case, the clause is unenforceable. Rather, it means that an arbitration or forum-selection clause in a contract is not enforceable if *the inclusion of that clause in the contract* was the product of fraud or coercion.

*Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 n.14 (1974) (internal citation omitted) (emphasis in original). In this case, Novak fails to allege any fraud specifically relating to the forum-selection clause in question. Further, there is no indication that the clause was added to the DNTA in bad faith, or by coercion. Plaintiff therefore has not established grounds for rejecting the clause on the basis of fraud.

### C. UNCONSCIONABILITY

Plaintiff also argues that the DNTA is unconscionable under New York law because he was never provided with an opportunity to view the contract or to consent to its terms. According to plaintiff, he was denied any "meaningful choice" with regard to the selection of Tucows as a registrar, thus demonstrating the contract's unconscionability. (Pl.'s Br., at 40.) However, plaintiff does not actually identify any particular terms of the contract that are substantively unconscionable; instead, he merely reiterates his assertion that he was never given an opportunity to read the contract, a factor that speaks to the agreement's *procedural* unconscionability.

"Procedural unconscionability involves 'the lack of meaningful choice,' which considers all the circumstances surrounding the contract, including whether each party had a reasonable opportunity to understand the terms of the contract, whether deceptive tactics were employed, the use of fine print, and disparities in education, experience and bargaining power." *Gill v. World Inspection Network Int'l, Inc.*, No. 06-CV-3187 (JFB) (CLO), 2006 U.S. Dist. LEXIS 52426, at *19 (E.D.N.Y. Jul. 31, 2006) (citing *Nelson v. McGoldrick*, 896 P.2d 1258, 1262 (Wash. 1995), and *Gillman v. Chase Manhattan Bank, N.A.*, 534 N.E.2d 824, 828 (N.Y. 1988)). While plaintiff maintains that he neither read nor assented to any agreement with Tucows, this Court has found that plaintiff did, in fact, "click-through" his assent to the DNTA. As a result, even if plaintiff failed to read the terms of the contract, he is nevertheless bound by the forum-selection clause. "[I]t is a fundamental principle of contract law that a person who signs a contract is presumed to know its terms and consents to be bound by them." *Paper Express, Ltd. v. Pfankuch Maschinen GMBH*, 972 F.2d 753, 757 (7th Cir. 1992) (enforcing forum-selection clause where plaintiff had not read the clause prior to signing the contract) (citing 3 Arthur L. Corbin, *Corbin on Contracts* 607 (1989), and 13 Samuel

14

Williston, *Williston on Contracts* 1577 (1988)); *see also Ainsley Skin Care of N.Y., Inc. v. Elizabeth Grady Face First, Inc.*, No. 97-CV-6716 (LAP) (AJP), 1997 U.S. Dist. LEXIS 19102, at *11 (S.D.N.Y. Dec. 2, 1997) ("[A] businessman acting in a commercial context, is held to have understood the consequences of his having signed [contracts], which designate [a particular forum] as the appropriate forum for any action arising thereunder. If [the complaining party] did not read them or hire counsel to do so, he is the victim of his own lack of diligence, not [the opposing party's] misconduct.") (quoting *Elite Parfums, Ltd. v. Rivera*, 872 F. Supp. 1269, 1273 (S.D.N.Y. 1995) (internal citation and additional citations omitted)); *Weingrad v. Telepathy, Inc.*, No. 05-CV-2024 (MBM), 2005 U.S. Dist. LEXIS 26952, at *11 (S.D.N.Y. Nov. 7, 2005) ("He is bound by the terms of the forum selection clause even if he did not take the time to read it because 'a signatory to a contract is presumed to have read, understood and agreed to be bound by all terms, including the forum selection clauses, in the documents he or she signed.'") (quoting *Sun Forest Corp. v. Shvili*, 152 F. Supp. 2d 367, 382 (S.D.N.Y. 2001) (internal citation omitted)).

In addition, although the DNTA is a standard form contract offered to all of Tucows' domain name transfer customers, the forum-selection clause may not be defeated for procedural unconscionability on this basis. The Supreme Court has recognized that where a company conducts business in several states, as in the case of Tucows, a non-negotiated forum-selection clause may be enforced even where it was not the subject of bargaining.[10]

*Carnival Cruise Lines, Inc.*, 499 U.S. at 593-595; *Rosenfeld v. Port Auth. of N.Y. and N.J.*, 108 F. Supp. 2d 156, 164 (E.D.N.Y. 2000) (noting that an agreement "cannot be considered procedurally unconscionable, or a contract of adhesion, simply because it is a form contract").

Finally, the Court cannot find that Novak was so vulnerable or that there was such unequal bargaining power that the contract was procedurally unconscionable, given (1) plaintiff's sophistication in attempting to choose a registrar that would allow him to respond more easily to pending litigation (Am. Compl. ¶ 39), (2) his extensive internet and business experience as owner of an extremely popular web company (Am. Compl. ¶ 134), and (3) plaintiff's broad computer expertise, acquired over the past thirty years (Novak Decl. ¶ 8).

---

[10] Novak contends that Tucows should be subject to jurisdiction before this Court because in an unrelated case, *Bennett v. America Online, Inc.*, No. 06-CV-13221, 2007 WL 241318 (E.D. Mich. Jan. 23, 2007), "Tucows had acquiesed to the jurisdiction of the United States Courts not with standing their forum selection clause." (Pl.'s Supp. Br., at 2.) In *Bennett*, which involved a copyright dispute against defendants America Online, Inc. ("AOL") and Tucows, the Eastern District of Michigan considered whether to transfer the plaintiff's case to Virginia pursuant to 28 U.S.C. § 1404(a), based upon AOL's forum-selection clause. *Bennett*, 2007 WL 241318, at *1. While not subject to any agreement with the plaintiff in that case, Tucows nevertheless consented to personal jurisdiction in Virginia. *Id.* at *6. However, *Bennett* has absolutely no bearing on the instant case, in which the plaintiff directly entered into a DNTA with Tucows, the plaintiff is clearly subject to the forum-selection clause contained within the agreement, and neither defendant has consented to jurisdiction before this Court.

Therefore, this Court cannot find that the forum selection clause at issue should not be enforced on the basis that Tucows' DNTA was either substantively or procedurally unconscionable.

D. PUBLIC POLICY

In *The Bremen*, the Supreme Court stated that forum selection clauses should not be enforced if "enforcement would contravene a strong public policy of the forum in which suit is brought." 407 U.S. at 18 (citing *Boyd v. Grand Trunk W.R. Co.*, 338 U.S. 263 (1949)). Plaintiff alleges that enforcement of the forum selection clause in Tucows' DNTA counters New York state's public policy as expressed in New York General Business Law § 349. Section 349 allows the state attorney general to bring civil actions on behalf of the people of New York state in order to enjoin unlawful deceptive acts or practices. N.Y. Gen. Bus. Law § 349. In addition, subsection (h) of the statute provides for an individual cause of action on the basis of such acts or practices. N.Y. Gen. Bus. Law § 349(h). Plaintiff curiously relies upon this Court's decision in *Gill v. World Inspection Network Int'l, Inc.*, which directly counters his position, in support of the proposition that litigating his case in a foreign forum would contravene Section 349. In *Gill*, the plaintiff argued that enforcement of an arbitral forum selection clause against franchisees contravened sections of the New York General Business Law that protect franchisees from fraudulent and unlawful practices by franchisors. 2006 U.S. Dist. LEXIS 52426, at *34-36. This Court held that "New York public policy does not operate to undermine the presumptive validity of the arbitral forum selection clause under the preemptive effect of the [Federal Arbitration Act]." *Id.* at *35. Likewise, there is nothing in Section 349 that undermines the presumptive validity of forum selection clauses as articulated by the Supreme Court and by this Circuit in *The Bremen, Shute,* and *Roby*. *See Person*, 456 F. Supp. 2d at 497 ("It is clear, from Second Circuit precedent, however, that far from being against public policy in this Court's jurisdiction, forum selection clauses are considered 'presumptively valid.'") (citing *Roby*, 996 F.3d at 1363). In fact, New York courts have consistently upheld forum selection clauses in which New York residents would be forced to litigate in another state or country on the basis that such clauses prevent confusion and costly litigation regarding where suits relating to the contract should be brought and defended, and reduce costs to the consumer by limiting the number of fora in which a case may be brought. *See, e.g., Effron*, 67 F.3d at 10 (finding it reasonable for cruise line to select a single venue for passenger suits) (quoting *Shute*, 499 U.S. at 593-94); *Hellex Car Rental Sys., Inc. v. Dollar Sys., Inc.*, No. 04-CV-5580, 2005 U.S. Dist. LEXIS 33858, at *16 (E.D.N.Y. Nov. 9, 2005) ("It is entirely reasonable for [defendant] to require that its franchisees agree to litigate disputes arising from the franchise relationship in Oklahoma, where its corporate headquarters are housed, rather than be required to defend suits in every state where its franchises may be located.") (citing *Carnival Cruise Lines, Inc.*, 499 U.S. at 593). As plaintiff is unable to show that enforcement of the forum selection clause in question would contravene New York public policy, the Court rejects his contention.

E. APPLICABILITY OF FORUM-SELECTION CLAUSE TO NITIN

Novak also contends that only his claims against Tucows are subject to dismissal pursuant to the forum-selection clause, and thus the case would be severed upon granting

a motion to dismiss on this basis. However, this Court has discretion to dismiss the entire lawsuit for improper venue. While it serves only as persuasive authority, this Court finds it notable that the "Third, Seventh and Ninth Circuits have determined that, in certain circumstances, a non-signatory to a contract may be bound by a forum-selection clause found therein." *Hay Acquisition Co., I, Inc. v. Schneider*, No. 04-CV-1236, 2005 U.S. Dist. LEXIS 24490, at *25 (E.D. Pa. Apr. 29, 2005) (collecting cases). Further, at least two courts within this Circuit have held that "[i]t is well established that a 'range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses.'" *Weingrad*, 2005 U.S. Dist. LEXIS 26952, at *15-16 (quoting *Int'l Private Satellite Partners, L.P. v. Lucky Cat Ltd.*, 975 F. Supp. 483, 485-86 (W.D.N.Y. 1997) (internal citation omitted)). A non-party to an agreement may be bound by a forum selection clause where the party is "'closely related' to the dispute such that it becomes 'forseeable' that it will be bound." *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993) (citing *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n.5 (9th Cir. 1988), and *Coastal Steel Corp. v. Tilghman Wheelabrator, Ltd.*, 709 F.2d 190, 203 (3d Cir. 1983)); *see also Weingrad*, 2005 U.S. Dist. LEXIS 26952, at *15-16 ("A non-party is 'closely related' to a dispute if its interests are 'completely derivative' of and 'directly related to, if not predicated upon' the signatory party's interests or conduct.") (quoting *Lipcon v. Underwriters at Lloyd's*, 148 F.3d 1285, 1299 (11th Cir. 1998) (internal citation omitted)). In this instance, plaintiff's claims against Nitin are nearly identical to those against Tucows. Furthermore, all of plaintiff's claims arise out of Novak's single transfer of his domain name, which was effected through both defendants in tandem.

It was certainly foreseeable that any claims Novak might raise against Nitin in relation to the transfer could be subject to the terms contained in his agreement with Tucows.[11] Novak's attempt to evade the effect of the forum-selection clause merely by joining Nitin, a non-signatory to the DNTA, therefore fails. *See, e.g., Hodgson v. Gilmartin*, No. 06-CV-1944, 2006 U.S. Dist. LEXIS 73063, at *45 n.14 (E.D. Pa. Sept. 18, 2006) ("Plaintiff should . . . be prevented from avoiding the impact of a valid forum selection clause by suing [parties] who were not signatories to the Customer Agreement."); *Am. Patriot Ins. Agency, Inc. v. Mutual Risk Mgt., Ltd.*, 248 F. Supp. 2d 779, 785 (N.D.Ill. 2003) ("[W]e also reject Plaintiffs' argument that enforcement of the forum selection clause is precluded by the fact that certain Defendants are not parties to the Agreement. Plaintiffs cannot escape their contractual obligations simply by joining parties who did not sign the contract and then claiming that the forum selection clause does not apply.") (citations omitted), *rev'd on other grounds*, 364 F.3d 884, 889 (7th Cir. 2004).

---

[11] Moreover, as a third-party beneficiary of the DNTA, Nitin is, "by definition," "closely related" to the dispute at issue and "foreseeably" bound by the forum-selection clause. *Hugel*, 999 F.2d at 209-10 n.7 ("While it may be true that third-party beneficiaries of a contract would, by definition, satisfy the 'closely related' and 'foreseeability' requirements, *see e.g., Coastal Steel*, 709 F.2d at 203 (refusing to absolve a third-party beneficiary from the strictures of a forum selection clause which was foreseeable); *Clinton v. Janger*, 583 F. Supp. 284, 290 (N.D. Ill. 1984), a third-party beneficiary status is not required."); *see also* Defs.' Ex. T1, at ¶ 1 ("'Services' refers to the domain name registration provided by us as offered through . . . the Registration Service Provider [Reseller]"); Defs' Ex. T1, at ¶ 3 ("As consideration for the Services, you agree to pay the RSP the applicable service(s) fees.").

17

In sum, the Court finds that plaintiff has not demonstrated that enforcement of the forum-selection clause in this case would be unjust or unreasonable. Therefore, the Court finds that plaintiff has failed to demonstrate venue by a preponderance of the evidence, and grants defendants' motion to dismiss for improper venue.[12]

## VI. LANHAM ACT CLAIMS AND PENDENT STATE CLAIMS

Defendants also contend that plaintiff's Lanham Act claims of trademark infringement, trademark dilution and cybersquatting are fatally defective since it cannot be shown that Nitin or Tucows used Novak's alleged trademark, "petswarehouse," "in commerce." According to defendants, because use of "petswarehouse" "in commerce" is a required element of any potential claim that Novak could assert under the Lanham Act, such claims must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6). (Nitin's Br., at 1-4 (citing *Savin Corp. v. Savin Group*, 391 F.3d 439 (2d Cir. 2004) (requiring "commercial use of the mark in commerce" to establish a trademark dilution claim)); Tucows' Br., at 11-15 (citing *Bosley Medical Institute v. Kremer*, 403 F.3d 672, 678-79 (9th Cir. 2005) (use of domain name incorporating plaintiff's mark in website critical of plaintiff does not constitute use in commerce), *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984-85 (9th Cir. 1999) (registrar not liable for contributory infringement by issuing registration of potentially infringing domain names to third parties), and 15 U.S.C. § 1125(d) (requiring "bad faith intent to profit" from a mark to establish civil liability for cybersquatting under the Lanham Act).) Having concluded that venue is improper before this Court, the Court need not address defendants' motion to dismiss the Lanham Act claims or pendent state claims for failure to state a cause of action.

## VII. CONCLUSION

For the foregoing reasons, it is hereby ordered that plaintiff's motion to strike is GRANTED in part and DENIED in part. Defendant Tucows' motion to strike is GRANTED.

It is further ordered that both defendants' motions to dismiss on the basis of improper venue are GRANTED in their entirety.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 26, 2007
Central Islip, NY

\*\*\*

Plaintiff appears *pro se*. Defendant Tucows is represented by Glenn Matthew Mitchell, Esq., Schwimmer Mitchell Law Firm, 40 Radio Circle, Suite 7, Mount Kisco, New York, 10549. Defendant Nitin is represented by Gary Adelman, Esq., Adelman & Lavania, LLC, 90 John Street, Suite 304, New York, New York 10038.

---

[12] Even if the burden to prove venue rested with defendants, rather than plaintiff, that burden would be easily met given the record in this case.